So, welcome everyone. I think you all are familiar with all of our rules, so I won't spend a bunch of time on that. We'll get right to our one oral argument for today, and that is the State of Louisiana v. Deb Haaland et al., and we will begin with the Sierra Club, George Torgan. This is case number 23-30666. Good afternoon, Your Honors. George Torgan on behalf of the appellants, Sierra Club, Center for Biological Diversity, Friends of the Earth, and Turtle Island Restoration Network. I'll be spending 13 minutes in my opening argument, and Ms. Melton from the Department of the Interior will then spend three minutes. On August 23rd of this year, the Bureau of Ocean Energy Management finalized Lease Sale 261, which offered more than 67 million acres of the Gulf of Mexico for oil and gas development. In addition to being one of the largest lease sales ever, Lease Sale 261 contained a few basic protections for the Rice's Whale, a critically endangered species that only lives in the Gulf and may consist of just 50 remaining individuals. Yet, less than one month later, at the request of the appellees here, the District Court required the Bureau to hold Lease Sale 261 without these protections, including a requirement that the Bureau add six million acres of the Rice's Whale's critical habitat. Now, let me ask you, do you have any evidence that anyone's actually seen them in kind of this part of the Gulf as opposed to this part over by Florida, this being the Gulf that they keep showing all the time? Yes, Your Honor. In the court below, appellants put forward a declaration from Dr. Rice, a marine mammal expert who has been involved in studying the impacts of the Rice's Whale, especially following the Deepwater Horizon oil spill. He summarizes the science, both visual sightings and acoustic detections. In the last couple of years, he has a map in that declaration showing all where the Rice's Whale has been found in the western and central Gulf. And this is new science. Okay, and where, can you tell me where that is in the ROA? So, yeah, sure. Dr. Rice's declaration, where he... No, I mean the thing that shows... Sure, his declaration is... No, I know his declaration, but... 7626-328, where he talks about... But where it shows it. Yes. Pictures. Is that where it is in that? I can give you the exact page number. Okay. It is in that declaration, around page 76, 7426 in the record. And so the entities you're representing, how is it that the fact that they would... Well, let me ask you this. What case supports the notion that wanting to see this Rice's Whale is enough to give you standing? Sure. Supreme Court in Lujan made it clear that the desire to observe an animal species, even for purely aesthetic purposes, is a cognizable interest for purposes of standing. The Supreme Court in Laidlaw stated that parties in environmental cases can demonstrate an injury in fact by asserting that they use an affected area and that their aesthetic or recreational interest will be lessened by a challenged activity. Now, that is exactly what we have here. Appellants have demonstrated standing through the declarations of Robert Weigel, Kenneth Saxon, and George Small. We have members that use these areas for different purposes, boating, fishing. Mr. Small, for example, scuba dives in Flower Garden Banks National Marine Sanctuary, about two-thirds of which is in Rice's Whale habitat. He plans to do so even in the middle of this month and continue to do so about six times each year. So these members have demonstrated that they use the Gulf for these purposes, that they desire to see Rice's Whales, that the existence of the whale increases their enjoyment of these activities, and taking away the protections for the Rice's Whale will likely cause harm to these interests. Does it matter that none of them have ever seen the whale? It does not. Under the law, there's no... I mean, I know there's this notion of wanting to see it, but I mean, I would like to see a dinosaur, but I'm not going to, at least not one that's alive. So, where do you fit that? In other words, it's hard to see these whales, and so I deeply respect this. That isn't the question. The question is standing, and then you get to the merits. So, the fact that you'd like to see something, while I understand that's important, if no one ever sees it, does that matter in this discussion? It doesn't matter for purposes of standing. As the Supreme Court said in the Lujan case, there is no authority that says a member must actually see an endangered species to have standing, and if that were the test, it would create a really big problem for a critically endangered species like the Rice's Whale, where there might be only 50 of them left, and they live, obviously, offshore. It would make it almost impossible for groups like mine that I'm representing here today to ever take action to preserve a species. Could your group sue to preserve the habitat off the east coast of Florida? Potentially, if the agencies that are responsible for designating critical habitat fail to do so. Is there any critical habitat for Rice's Whale on the east coast of Florida? There is in the northeastern Gulf, in a place called the Soto Canyon that was thought to be their core area for the first few years that this species was actually found out to be its own individual species. Recent science now shows that they actually use a narrow band of habitat along the western and central Gulf between about 100 and 400 meters in depth, and that is something that scientists have really just discovered in the last couple of years that the agencies are now grappling with, and we know just in July of this year, the National Marine Fishery Service  I'm sorry if the acoustics are off in here, the east coast of Florida, so off the Atlantic coast. Oh no, not in the Atlantic coast. It is a whale that lives purely in U.S. waters inside the Gulf. And your basis for that? That is the current science. And I'm asking for the science. Obviously, there have been seven of them found off of the east coast of the United States, and so I'm wondering why it is, what is the confidence that between 100 and 400 meters below the surface, you wouldn't find a Rice's Whale, say, off of the east coast? I understand that there's been some scientific studying outside of Norfolk, understand some off of Jacksonville, but there's obviously a large piece of the Florida coastline, and I'm just wondering how far your theory of standing goes. I'm not aware of Rice's Whale detections on the east coast on the Atlantic seaboard. Okay, so am I understanding your argument that if you don't know that the Rice's Whale is off the east coast of Florida, you wouldn't be able to sue to say we'd like to preserve critically designated habitat off the east coast of Florida? I agree. That would make a very difficult lawsuit. So then I don't understand how you can go east, I'm sorry, west, excuse me, of the last designated Solderville observation to go all the way to the end of the territorial jurisdiction of the United States to the western coast, the western end of the Gulf of Mexico. There's no basis to believe that there's a whale over there, right? There is a basis. And what's that? The latest science, both visual sightings and acoustic detections of their calls. Well, I'm sorry, I'm missing the acoustic calls. So I looked at the NMFS designation, the one from July of 23, and I don't see any basis for extending all the way to the western edge of the territorial jurisdiction of the United States, other than the fact that that's as far as the U.S. government has jurisdiction to regulate. There's no acoustic testing west of the, what is the one, Flower? Flower Garden Banks. Flower Garden, thank you, right? Or am I misunderstanding what's in the record? There is evidence in the record, and I will get you the page number for Dr. Rice's on his map. Let me ask you a question about the client. If we still suppose that we would order the police to proceed immediately, would your client be in a position to proceed even though there's no bid? Well, the lower court, that's exactly what the lower court did, and I'm not understanding your question about how our client would proceed. You mean how our client would proceed? Can you rephrase? You're not understanding the question? No, sorry, Your Honor. If we hold that the police sale must proceed immediately, would your client be in a position to comply with that? So, I represent environmental organizations that are trying to preserve the Rice's well protections, and if you ordered the sale to proceed, I don't know, other than taking this case to, on bond court or to the Supreme Court, that there's much that we could do. But that's what, that's how you would proceed? Well, we would, we would like this court to reverse the district court's injunction, and one of the primary reasons is the court's injunction violates fundamental principles of administrative law. Not only does it fail to preserve the status quo, but it actually ordered the Bureau to hold a lease sale different than the one the Bureau determined was appropriate. Now, we know the appropriate remedy in an Administrative Procedure Act case is to set aside and remand an action to the, to the agency, because it's the agency that needs to fix whatever deficiencies that the court finds. What if it's in the terms? Then the lease sale, I assume, would go forward under, under the terms that the district court ordered, which we think is fundamentally inappropriate. Supreme Court in the, in the Calcutt case just earlier this year has said that a mandatory injunction like that is something that should only be issued in rare circumstances, when there's really no uncertainty about what the outcome should be on remand. Now here. Well, what about the, the fact that, okay, even with the sales, there's still more steps down the road. How do those steps get impacted? In other words, maybe down the road, they can put some more restrictions and so on and so forth. That's true. The Bureau does retain discretion in the third and fourth stages of offshore leasing to enact species protections if it finds them to be appropriate. One of the things that's really important at the lease sale stage, though, is where the, the lease sale as a whole is being looked at. And obviously, once you're allowing for development in Rice's Well habitat, there's going to be a lot of industrial activity. I think the Bureau made the right decision here, knowing what it knows now about the Rice's Well, to take its habitat out of the picture. Because even if you put protections in place, you're still, once, once leases are issued within the habitat, there's going to be a lot of industrial activity. We know that vessel strikes, noise, oil spills, those types of things from oil and gas. Well, and I understand that there's work, but these, you know, some restrictions on like, like I've been on cruises where you go through and you can't just drive over, you know, ice buckets and this kind of thing. So, you know, people in boats, in vessels, in whatever, can be restricted in ways that keeps them away. Like if they see a whale, they can't go drive over the whale and so on. They should be looking, you know, on cruises, they're always looking for other ships and they're looking for other things on the ground of the water and so on. So I guess I'm wondering why can't that apply that keeps most of what the district court ordered, but allow some restrictions that help these whales? Well, I agree. And those are the exact types of restrictions, speed limits, having observers, avoiding nighttime transit. That's what the Bureau did here to protect their Isis whale. That's what appellees are challenging and which the district court ordered. But they could bring back some of that down this road that they're still going down of these leases. Isn't there a number three and four and so on? Yeah. So that's what I'm wondering. Yes, it is. It is possible. I think a big concern of my clients is the fact that there's going to be oil and gas development right within the Isis whale habitat, right within the habitat of a very critically endangered species. And these are the exact types of activities that are pushing the species to extinction. I see I have about 20 seconds left, so I'll at least make one final point. We also think the district court improperly found a likelihood of success on the merits. There hasn't been a notice violation here under OXLA. The Bureau explained this decision and why it put these protections in place. We also think that the district court failed to properly consider harm to the Isis whale in balancing and considering the public interest. I see that my time is up. You've saved time for rebuttal. Thank you so much. Thank you, Your Honor. It's an interesting case. All right, and we'll turn now to the Hayland, Michelle Melton. Good afternoon, Your Honors, and may it please the court. Michelle Melton on behalf of the federal defendants. I'd like to reserve one minute for rebuttal. The government's goal in pursuing its limited appeal is to ensure that regardless of how the court rules on the underlying substance of the district court's preliminary injunction, the court allow the agency sufficient time to comply with OXLA's notice provision to ensure... So let me ask you, if we were to affirm the district court, obviously we can't affirm selling on September 30, 2023. I get that, but what is the timing then if we were to say, affirmed, and that was our whole opinion, what would be the timing in that situation? Well, Boehm, the agency here is prepared to follow the court's direction, but we have asked in this appeal for 37 days, and we think... So you would still want the 37 days, even though you've thrown out basically what the court's kind of hanging? Your Honor, respectfully, we didn't throw anything out. We've been respectfully following court's orders all the way along. We were prepared when we got a last-minute order to hold the sale, but we sought relief in this court. This court granted it, and we were prepared to proceed with the sale on November 8, as this court ordered. We got an unexpected order from this court amending that order, and we decided that, and we think reasonably the best thing to do would be to preserve the court's ability to rule on the merits of this case. We think there are potential mootness issues, both for our appeal and for intervener's appeal, and we wanted to... We thought the prudent course was to put things on pause so that this court could rule on the merits, but we still think that OXLA's notice of provision is important here and provides... So you still need the 37 days regardless of what we rule? That is our position, and we think that that is consistent. Totally rule that you can't sell anything. We would request that regardless of how this court rules on the substance of the... Okay, and why have you all pulled back from what the other group just talked about? If you're asking why my client has not decided to appeal the full range of what we could appeal at this stage, that's a decision that the Solicitor General made pursuant to many reiterates. There are lots of considerations that the government thinks about when deciding, when the Solicitor General thinks about when deciding whether to take an appeal. Some of these are resource issues. Some of these relate to the merits, but in any particular case, I'm not commenting obviously on why in particular we chose to pursue this narrow appeal in this particular case. But regardless of why we ultimately sought the relief, we are still here asking for 37 days or sufficient time to comply with OXLA's notice provision. And how can we pursue the 37 days? How can we limit the time? Well, the 37 days would be to allow Interior to issue a notice in the Federal Register, and the Federal Register notice would state the date and time of the sale, when bids would actually have to be received by the agency, and typically that's one business day before the sale is actually held. And then on presumably the 37th day, if that's what this Court orders, the agency would hold the sale itself. And on that day, BOEM would open bids. Was that responsive to Your Honor's question? I'm not sure. Okay. Thank you. You've saved a minute for rebuttal. Thank you. All right. We'll hear from Paul Clement for the State of Louisiana. Good afternoon, Your Honors. May it please the Court, Paul Clement for the Appellees. I'm joined at Council table by the Solicitor General of Louisiana. Your Honors, Congress was clear in the Inflation Reduction Act that it wanted lease sale 261 to proceed in accordance with the original 2017 record of decision and that it wanted the lease sale to happen no later than September 30, 2023. That provision of the IRA did not spring from the ether, but it was a direct response to Biden Administration's unilateral decision to pause offshore development in the middle of lease sale 257. Congress's response was clear. Get on with it. Award the bids in sale 257 and conduct lease sales 258, 259, and 261. So what about these environmental issues? You know, the government originally wasn't going to pull back all of the places that were going to be in the bidding. It was just going to pull back a small percentage, which is what you're objecting to. But what about these environmental issues and the fact that these rice whales, there just ain't very many of them and we need to preserve them? So, Your Honor, there's a couple of things to say about that. First of all, the rice whales and where they were and the latest evidence in the SOTAVIA report was all considered by the agencies in the supplemental EIS in January of this year. In January of this year, they took a look at that data and they said that it was inconclusive and that the risk of a vessel strike was, to quote the supplemental EIS, exceedingly unlikely. Now, a critical thing about that supplemental EIS, and I think it ultimately explains why the government didn't appeal on the merits here, that supplemental EIS was for both the 259 lease sale and the 261 sale. And so based on that consideration of the environmental evidence and the concerns about the rice whale and all of the rest, in March of this year, sale 259 went forward without these kind of restrictions. And in the same month, that's when the notice came out for 261. And in that notice, the 6 million acres that are at issue here were in the proposed sale and these debilitating restrictions, speed limits and no sale zones at night, none of that was in there. So there is a process for taking into account these environmental considerations. It is not a last minute switcheroo on only one sale. And here's something I think is really important. There is an ongoing process that's going to consider the locations of the rice whale and all the latest evidence. And when that process runs its course, they will make a determination. And if they make a determination that there actually are rice whales and their critical habitat is larger than anyone has thought previously, that will apply to all offshore proceedings uniformly. It won't just be limited to the petroleum industry. It won't just be limited to sale 261. So are you disagreeing that the rice whales are in this more western part rather than just the cubby by Florida? Absolutely. I'm disagreeing with that. OK, because you're saying that, I mean, what he cited to didn't help me that much. But basically, he's saying that the evidence is that, yes, the rice whales are in this arena all the way to Texas. So we vehemently disagree. Obviously, though, this dispute is before the agency. Now, this late breaking declaration for litigation only, I don't think that matters at all. What matters is the SOTAVIA study. The SOTAVIA study, which is actually it's a 2022 study, but it's actually looking at from 2016 and 2017. But that was before the agency in the supplemental EIS. They looked at it. They got comments from the interveners that said, look at this brand new study we have. The whales aren't where you think they are. And you should put these exact moratoriums into the proposals. And they did that in the notice and comment process for the supplemental EIS. And so in January of this year, the agency looked at that and they said, no, this is really inconclusive. There's some of these stations where there's no acoustic recordings at all. And if one whale on one occasion strayed from its normal processes, that doesn't create a new critical habitat. So in any event, but what's that? I don't know, Your Honor, because they never explained it. They didn't even acknowledge that they were changing their mind. And I've had cases where there's a change in administration. And six years later or eight years later, they changed their position. But we're talking changing a position that they took based on notice and comment in January of this year. And then they took that position. They didn't change their mind for 259. They continued to defend 259 in parallel litigation in the District of Columbia. So if I may dare venture a guess as to why the Solicitor General didn't want to approve a merits appeal here is because the government would be taking a position that is diametrically opposed to the position they're taking in defending the lack of these restrictions in lease sale 259. And if I could just make the plea that the way to protect the rice whale is not as a last-minute switcheroo in a particular lease sale. There is a statute that's designed to take this into account, consider all of the evidence, and if there is a change in habitat, it will apply to everybody. It won't just be one lease sale. It won't just be the petroleum industry. And I think it's very telling that the 28-year letter we filed with this court last Friday or this morning. I guess it was last week, just late last week. But the National Marine Fishery Service looked at a proposal by environmental groups to put comparable speed limits on the part of the Gulf where everybody agrees that the rice whale actually is, and the agency decided not to do that. So what's happening here is the same agencies that were responsible, or at least ultimately the Unitary Executive up to the top were responsible, for putting a unilateral stop on development in the Gulf, they are all of a sudden singling out one lease sale for restrictions, and they're doing it under OXLA. Okay, I understand your thing about what's up there for the lease and not restricting that, but I'm not understanding why you wouldn't want vessels to be careful and have somebody, sort of like I said on my cruise ships, they always say they have X, Y, Z, but they always have a human looking for other ships for this, for that, so that we don't run into it. And to me, why wouldn't you all want that in what you're doing? Do you just want to be running into stuff, whether it's the whale or it's something else? Absolutely not. Okay, so why not have that in place? Because what the restrictions are debilitating, Your Honor, the restrictions aren't look out for the whale, they are a prohibition on sailing through a barricaded area of the Gulf at night at all, and then there are strict speed limits and observer requirements and all of the like, and all in the context of a whale that the last time the agency actually looked at this and explained its work, it said that the prospect of vessel strikes are exceedingly unlikely. Now, obviously my clients do not want to strike anything, including an endangered whale, and if they did, it would probably shut down development in the Gulf for quite some time. So we had no interest in doing this. But this is just a backdoor way to shut down an industry with restrictions that are very debilitating, but don't make any sense. And again, Your Honor, if it makes sense to have some restrictions, they ought to apply not just to lease sail 261, they ought to apply to all the operations off the Gulf. They shouldn't apply only to oil vessels or petroleum vessels, they should apply uniformly. And there's a process for doing that, and that is the ESA and all of that process that goes with it. And to do this through the backdoor in Oxla makes no sense at all, because if you put the ESA and Oxla side by side, the demonstrably obvious thing about Oxla is it is a far more pro-development statute. So the idea that there's a restriction that to date the government won't put in place under the ESA, but the agency somehow smuggled in in a particular lease sale under Oxla, that is just backwards. That is absolutely backwards. You also don't have to look hard for why this happened. There's parallel litigation in Maryland that BOEM isn't even a party to. But as part of that, somebody said, hey, well, why don't we put a restriction on lease sale 261? And so after the comments were in, after all of the notice was done, this was smuggled in at the last minute. This is about as egregious a violation of the APA and Oxla as you are likely to see. I also think it is a blatant violation of the IRA itself, which not only said do this not later than September 30th, but said do it in accordance with the 2017 record of decision. And this new stipulation is nowhere there. So I think we're— Let me ask you this. If we were to affirm the district court, obviously, again, it can't be held on September 30, 2020—or by September 30, 2023. Do we give them the 37 days? My clients would be happy to give them 37 days. I'd prefer that to be 37 days from, say, today or tomorrow. So what we would propose is that you affirm the preliminary injunction with instructions for the government to hold the sale within 37 days of the mandate issuing and then note that the mandate should issue forthwith. So we're happy to give them the 37 days. The reason we didn't give them 37 days before was that that would have been just inconsistent with the IRA statutory deadline. We're now past that, but I don't think the statute goes poof. I mean, the, you know, the continuing clear intent of Congress was for these sales to go forward forthwith. And what the, you know, the agency—I mean, for example, the interveners would like this to go all back to the agencies, to go back to square one and start over, and then we can have another round of, you know, litigation. And before that's all done, the one thing that will be clear is that Congress's will in the IRA, these relevant IRA provisions, would be absolutely flouted, because they wanted this to go forward. They wanted this all done by September. So we're in a situation where we're in the second best world, but if you issued your decision in the next, say, 24 hours and said, gave them 37 days, well, you could do opinion to follow. I mean, you know, these things have happened. And if you gave them 37 days, I think if my math is right, we could still do this in calendar year 2023. So we are perfectly happy to live with that. I'm sorry? So the idea, and I think we agree with the government on this, the 37 days would give a window for the bids to be resubmitted. So then by the time the 37 days are up, they'd open the bids, and we'd be going, and they would have bids that wouldn't be subject to this unique restriction, and we would have bids for the 6 million acres that have been withheld. And all of that is going to be a substantial benefit, certainly to my clients. I represent all appellees here today, but I specifically represent the API. But it's also going to be a major benefit for the state of Louisiana. Because, again, if you understand that all the operations going forward, if there ever is an ESA determination that this is critical habitat, if that survives the appeal, and if they do do that, I promise you that my clients will try to resist that. But if that all happens, it's going to apply to all the leases, it's going to apply to all of the operations equally. What is so problematic about this is by singling out this lease sale. The government is just artificially suppressing the price of these leases. Because even if, you know, in the interim, they're immediately going to be subject to these restrictions that nobody else is going to be subject to. And so, you know, honestly, if the government were focused on the bottom line of trying to maximize the value of these leases, they would never do this, because the state of Louisiana participates in the value of the leases. They are being directly harmed by what the government is doing here. And, again, if you sort of just take a step back, like, the risks here are entirely asymmetric. Because if the interveners can ultimately prove their case to the government's satisfaction that the whales have moved, like, they haven't missed their opportunity to put restrictions on operations in the Gulf. And they will apply uniformly. And they will apply to the- Just saying down the road. Absolutely. The three and four or whatever. But not just three and four. I mean- But in general. In general. And they'll apply to, like, you know, cruise ships, too. Well, let me ask you this, though. There is evidence that they've been looking for the rice whales, that they're out in the Gulf, the individuals that filed affidavits. So why doesn't that give them standing? So here's what I think that you need for standing. You don't- I mean, you know, especially when you're down to, you know, 50 of a species or- you don't need to see one. Because that may be just, you know, all but impossible. But you do need to say that you have an actual intent to go to the place where they are and have best efforts to try to see them. So, you know, you don't have to say, like, I'm going to- I saw a cave spider. But you have to go to the cave where the cave spiders are. Or they have to go to Florida. Well, no, if they really think they're here- Yeah, but they have said they're looking for it. They said they're looking for them. But they said they're- if you really read these affidavits, and it's- you know, the ones they filed in the district court don't even get them close. So my friend focused on the three that have been filed only in this court. And if you actually read those affidavits, they fall short of saying that people are- have a present intention to take a specific trip to go between 100 and 400 of the isobaths to look for these whales. You know, Weigel, for example- What case says they have to do that? They have to say that? I think that's Lujan. We're all reading Lujan. You know, Lujan's not a great case for them. So if an environmental lawyer comes into court and tells you their best case is Lujan, I think that's a pretty good day for the defendants. So I would invite you to read Lujan with this issue in mind. And I also would read the Weigel Declaration, because one of the things that Lujan unambiguously says is that some- Is Lujan good for the defendants, or do you mean it's good for you? It's good for the- yeah, I'm sorry, I misspoke. I'm used to representing defendants. But it's good for the appellees. Sorry. Okay. So- so- but- but if you look at the- the- the declaration in- rather Lujan, one thing that's crystal clear is that someday intentions don't count. So if you look at the Weigel Declaration, he averts to that and says, well, in fishing, someday intentions are all you get. And then- and then he sort of says, when the weather cools down and, you know, the conditions are right, you know, I'm- I'm gonna- I'm gonna go out there, by golly. I don't think that gets it done. I mean, you know, it's- it's- it's a little bit weird that we're fly-specking exact paragraphs of this- of this declaration, but I think that's what you have to do. And I think there's a reason- Let's say, what if we think they have shown that? Then what else is missing, in your view, from standing? I think- We think they are looking for the whales. Yeah, no, no. But they have to say, I have a present intention of specifically going out in the Gulf, not into- to Florida, but into this part of the Gulf with- with the- with the purpose of looking for these whales. And I think if you read the declarations with that in mind, they- they- maybe they come close, but they do not get there. Okay, but this is a hypo. What if we think they have shown that? Then what else do you think is missing from standing? I don't- I don't know that there's anything else. I mean, look, in this case, it's- I'm not really sure what their redressability is because they can get all their injuries sort of fully redressed based on the ESA. But our- our- our main point on the intervener standing is that they haven't gotten to that point. They haven't crossed the line. And I think there's a reason. If you actually wanted to see these whales, you would not go into our part of the Gulf. You would go to Florida. That's what you would do if you really wanted to see these whales. So the reason that their truthful affidavit- affiance won't actually say what I'm sure my friends know would put this issue to bed, which is to say, I'm going to take five trips in calendar year 2024 to between 100 and 400 isobaths, and I'm going to look specifically for the rhizus whale there. Because if somebody really wanted to see the rhizus whale, they'd go to Florida. They wouldn't go to that part of the Gulf. And one just minor clarification point. One of their affiance talks about the- the- the flower garden area and the restrictions on that anyways. So even apart from this withdrawing this 6 million acres, that would be a problem to say, well, you know, I'm going to go to the flower garden area because that area is not part of the lease sale for- for other reasons. So what they- they just don't have, and I think again, just to stress it, what they don't have, there's a good reason they don't have. If you wanted to see these whales, you wouldn't go to this part of the Gulf at all. So nobody's actually said that. And if you decided that, of course, you would affirm the decision below and you would do so based on the intervener's lack of standing. Because as I read their reply brief, they didn't even take issue, as we pointed out, that they need- if they want independent relief, they need independent standing and appeal. If you want to see a kangaroo, but it turns out there's a kangaroo in- in New York where there usually isn't one in New York City, that might be more exciting than going to see them where they usually are. So, I mean, I don't- I don't know that that's necessarily determinative. The fact that you can go see them somewhere else, does that mean you cannot get standing by saying you're trying to see them in this other area? Not as like a matter of pure law. I'm not saying that. But what I am saying is when you're talking about an endangered species where it's going to be pretty hard to see them anywhere. If you had somebody whose sole mission in life was to see a rice whale, they wouldn't go to this part of the Gulf. They would go to Florida. So I think the reason they're having trouble finding a declarant who actually says, I'm so interested in the rice whale, I'm going to go where they are not. Or where they are almost never. They just can't find that person because it's kind of an irrational claim. But whether we win this on standing or whether we win it on the merits, the most important thing from the perspective of my clients is that the relief issue quickly- again, we're willing to give them the 37 days. But we really would like that 37 days to start counting as soon as possible. And my friends make a number of interesting arguments about mandatory injunctions and preliminary injunctions and all of that kind of stuff. But the thing they miss is the IRA. The IRA is the unusual circumstance here. It's Congress telling the courts and the agency that we want this done and we want this done as fast, as practical, as humanly possible. And there are specific dates. And just to review the bidding here, you know, with respect to the Gulf, the IRA addressed three sales. With respect to 257, they already had the bids in hand when they declared the moratorium and Congress said issue them immediately. With respect to 259 and 261, they said by March 31st and by September 30th. With 257 and 259, the government followed Congress's will. And with 261, for reasons that still are a little opaque to me, they decided to flout Congress's will. The way to restore Congress's will is to order relief forthwith 37 days. Thank you, Your Honor. Thank you. All right. We'll turn back to Mr. Torgan. I hope I'm pronouncing your name right. Torgan. Okay. First to address the record side at OU, I missed it by a page. It's 7425. That's where Dr. Aaron Rice, in a declaration we submitted in the report below, plots both visual sightings and acoustic detections of the rhesus whale as far west as Corpus Christi, Texas. Between that declaration and the National Marine Fisheries Service's recent proposed critical habitat of these very same areas, this whole band of habitat across the western central gulf, shows that the best available science indicates that the rhesus whale does inhabit these areas. What about this notion that your people should go to Florida if they really want to see one of these whales? DeSoto Canyon would be a place that has been considered the rhesus whale habitat. We don't have to go to any one particular spot. But I think why Lujan is a good case for us. Not only does the Supreme Court say that the desire to observe a species is an interest for standing. It's clear that our members here are very much distinguished from the declarants in Lujan who were talking about species that were halfway around the world. And the court said, well, a Sunday intention to go visit them years in the future is not good enough. Here we have members who regularly go out on the gulf for different types of recreational activities. And those members state that they are looking for rhesus whale, that the existence of the whale increases their enjoyment of those activities. I mean, even your opponent, who seems to not care too much about these whales, would probably think it's cool to see one. I mean, so I guess, is that all that matters? All that is required is that we have members that use an affected area. They visit that area regularly. They intend to do so in the future. And that their interests will be impacted by this injunction that's taking away protections for rhesus whales. I wanted to address Judge Clement's question about, well, what made the agency change its mind here from Lease Out 359. The record shows, and both in the record of decision, the decision memo, there are two main things that have been happening. First, the Bureau has been engaged in reconsultation on the biological opinion governing oil and gas operations in the gulf. That process is much farther along than it was in January. In fact, the Bureau has been working on a new biological assessment that was supposed to be done on September 1. So they've been looking at the recent science regarding the whale. The other major thing that has happened in between Lease Out 259 and when Lease Out 261 was finalized was this proposed critical habitat. And the Bureau has indicated, and this is on pages 7027 and 7029 and 30, that they have a duty under the ESA to confer with the National Marine Fisheries Service about that proposal and how it's going to impact agency actions. I see that my time is up, unless your court has any further questions. We respectfully request that you reverse the district court's injunction and remand for anything further consistent with this court's opinion. Thank you. Thank you. One more minute. Thank you, Your Honors. I just have two quick points. Mr. Clement twice said that he knows why the Solicitor General did not authorize an appeal. And he said that it's because we don't think we have strength on the merits. He is wrong about that. We stand by the position that we've taken in the district court. We have not abandoned that position. We think that this preliminary injunction is inappropriate. We just have not sought to appeal that at this particular stage. And I would defer you if you're interested, excuse me, I would refer you if you're interested to our district court briefing to see our position. The second thing that Mr. Clement said that I strongly disagree with is that this is part of a broader conspiracy on the part of BOEM to restrict oil and gas leasing on oil and gas lease sales. That is false. And in fact, as Mr. Clement recognized later, every other lease sale that was in the IRA, the government has expeditiously sought to carry out. So in 257, where there was no moratorium, I believe Mr. Clement misspoke, there had been a vacatur of that lease sale. BOEM affirmed the bids within 30 days and filed a motion to dismiss. BOEM held lease sale 258 on time and is currently defending that sale, which was held in Alaska against environmentalist suits. It held 259 on time and is currently defending that sale against environmental suits. And but for plaintiff's lawsuit, it would have held lease sale 261 on time. Thank you, Your Honors. Okay. Thank you, everyone. We appreciate the argument. The case is now under consideration.